# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JESSE MAURICE STINSON,

                        Petitioner,      :               Case No. 3:25-cv-129

       - vs -                          District Judge Thomas M. Rose
                                           Magistrate Judge Michael R. Merz

WARDEN, Madison Correctional
  Institution,

                                      :
                      Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case, brought *pro se* by Petitioner Jesse Stinson pursuant to 28 U.S.C. § 2254, is before the Court on Respondent's Motion to Dismiss (ECF No. 13). Respondent asserts Stinson's Petition is barred by the statute of limitations and his claims are procedurally defaulted. Petitioner opposes dismissal, asserting he is entitled to statutory tolling on several grounds and equitable tolling as to the others (Motion in Opposition, ECF No. 18). Respondent has not filed a reply memorandum in support and the time for doing so under S. D. Ohio Civ. R. 7.2 has expired. Thus the Motion is ripe for decision.

Because a motion to dismiss is a dispositive motion under 28 U.S.C. § 636(b), the Magistrate Judge offers the following report and recommendations.

**Litigation History**

On February 21, 2013, a Montgomery County Grand Jury returned an indictment charging Stinson with four counts of murder/proximate result with a firearm specification (counts one, two, three and four); two counts of aggravated robbery with a firearm specification (counts five and six); one count of aggravated burglary with a firearm specification (count seven); and one count of having weapons while under disability (count eight)(Indictment, State Court Record, ECF No. 12, Ex. 1).

The case was tried to a jury in September 2014 with Common Pleas Judge Barbara P. Gorman presiding. Stinson was found guilty on all counts and sentenced to thirty-two years to life imprisonment. He appealed to the Ohio Court of Appeals for the Second District, raising as assignments of error that the verdicts were not supported by sufficient evidence and were against the manifest weight of the evidence, that his motion for a new trial should have been granted, and that the murder and aggravated robbery counts should have been merged under Ohio Revised Code § 2941.25. That court affirmed, making the following findings of fact:

> {¶ 6} According to the State's evidence at trial, on October 10, 2012, Tyree North was shot in his home, located at 8180 Mount Charles Drive in Huber Heights, Ohio. The shooter, Stinson, was in North's home to discuss Stinson's claim that North had "fleeced" him, i.e., sold him bad drugs. After North was killed, Stinson and another man took several items from North's home and transported them to another residence on Garfield Street. North's friend, James Demmons (aka "Bow"), had introduced Stinson to North and witnessed both the shooting and the robbery.

> {¶ 7} In October 2012, North resided at the Mount Charles residence with his girlfriend, Chiaki Takahashi. The residence was a small ranch home with a kitchen to the left of the front door, a living room to the right of the front door, and two bedrooms along the rear wall of the house. The couple used one bedroom as a master bedroom, and North used the second bedroom (behind the living room) as a

music studio, where he recorded, mixed, and remastered music. North both rented out the music studio to others and produced music there himself.

{¶ 8} North considered Demmons, who was 20 years old in October 2012, to be like a little brother. Demmons would come over to North's home every other day to record music with North. Demmons lived with his girlfriend, but he often stayed at the home of Cynthia Poole, who lived at 8143 Mount Charles Drive, approximately five houses south of North's home; Demmons grew up with Poole's children and had known Poole his "whole life."

{¶ 9} Stinson was Poole's then-boyfriend, and Demmons had met Stinson at Poole's home a couple of months before North's murder. In September 2012, Stinson had asked Demmons if he knew anyone from whom Stinson could buy powder cocaine ("girl"). Demmons was aware that North used marijuana and sold both marijuana and cocaine. Demmons had called North and asked if he would sell drugs to Stinson. North had agreed and Demmons had taken Stinson to North's home, where North and Demmons completed the transaction. North sold drugs to Stinson two or three other times; Demmons was always with Stinson when Stinson was at North's residence.

{¶ 10} On the morning of Wednesday, October 10, 2012, Takahashi drove North to a drive thru, where North purchased two cans of beer. Takahashi indicated that North typically bought only one can for himself, and she asked him if were expecting someone. North responded to her that he was "just stress[ed] out." Takahashi dropped North off at their home and then proceeded to work.

{¶ 11} Demmons testified that, at approximately 10:00 a.m. or 11:00 a.m. on October 10, Stinson called him and told him that North had sold Stinson fake cocaine ("fleece"); Stinson had made a similar allegation to Demmons a couple of days before. Stinson told Demmons that he wanted his money back. Demmons called North to tell North that he and Stinson were coming to North's house. Demmons testified that Stinson brought a satchel with clothing and other items with him.

{¶ 12} Once there, Stinson confronted North about North's "supposedly fleecing him." North denied the allegation, and the men argued. Demmons apologized to North for "bringing trouble to his [North's] house," grabbed Stinson, and led Stinson to the front door. North headed down the hallway to his studio. As Demmons and Stinson got to the front door, Stinson turned around and shot North

3

in the back of the head with a silver and black semiautomatic weapon. The shot was fatal.

{¶ 13} Demmons testified that Stinson pulled on "doctor gloves." Stinson's friend, who Demmons identified as "Walls", drove up to North's house in a blue Ford Explorer, came inside, and also put on gloves. The two men then began to put North's music equipment and other items in bags. Demmons testified that "Walls" also disabled a smoke detector, because it had started to go off.

{¶ 14} Demmons testified that Stinson wore an earring in one ear and that Stinson took an earring from North's ear. Takahashi and Demmons both testified that North wore the same earrings in both ears every day; they described the earrings as "box shape, black diamonds" and "black flame with black diamond like a square." The coroner testified that North had only one earring when his body arrived at the coroner's office.

{¶ 15} Stinson, Demmons, and "Walls" remained at North's house approximately 10–15 minutes. Stinson told Demmons to carry some of North's possessions, in a duffle bag, out to Walls's truck; Demmons complied. They then drove to the home of Gerry Stinson, Jesse Stinson's cousin, at 130 Garfield Street. While they were driving, Jesse Stinson mentioned that he had forgotten his bag of clothes at North's house; Demmons had last seen the bag in the studio. After arriving at the Garfield residence, Demmons saw North's studio equipment and other items being taken into the residence.

{¶ 16} Gerry Stinson testified that, on October 10, he woke up to find Jesse Stinson and "Jimmy" talking with Gerry's roommate, Dujuan Patton, in Patton's bedroom. At some point, Jesse Stinson and "Jimmy" went out to the front porch. Gerry Stinson overheard Jesse Stinson and "Jimmy" discussing a robbery. From the living room, Gerry heard Jesse say something about somebody "freezing up" and Jesse asked Jimmy about why Jimmy "didn't ring the doorbell." Gerry did not hear a response to the question. Gerry next heard Jimmy ask Jesse, "Why'd you shoot him?" Gerry Stinson testified on redirect examination that Jesse Stinson did not say anything in response to the question. The next day, Gerry Stinson noticed that there was recording equipment in the house that he had not seen before.

{¶ 17} Takahashi returned home from work around 5:00 p.m. on October 10. She went in the front door using her key, but it appeared to her that the door was already unlocked. When she walked in, she

4

found North lying on the floor, face down near the end of the hallway and unresponsive. One of his earrings was missing. While checking on North, she could see into the studio and immediately saw that items were missing and the room was in disarray. She also noticed that the smoke detector was also removed. Takahashi called the police.

{¶ 18} At trial, Takahashi testified that a laptop, keyboard, a music device, a television, a microphone, and an Xbox were missing from the studio. Takahashi's iPod and iPod dock were missing from her bedroom. A DVD player was taken from the living room. Takahashi had told a detective that two pairs of boots were also stolen. A broken Xbox and the television in the living room were not taken.

{¶ 19} Officer Michael Reckner, an evidence technician, responded to Takahashi's call. Other officers and paramedics responded soon afterward. Officer Reckner checked on North, informed the paramedics what was going on, took Takahashi outside, and began to photograph the scene. When the paramedics were done, the officers went outside while a search warrant was obtained.

{¶ 20} Officer Phillip Green was called to North's Mount Charles residence as part of a critical incident response team. (The paramedics had already left when Green arrived.) Neither Reckner nor Green saw indications that the house had been broken into. Detective James Gebhart, the lead detective, testified that several items were collected for fingerprinting and that some cameras and a voice recorder were also collected. One of the cameras, a Bell & Howell Take 1 digital video recorder, was found under a "pile of clothing" in the studio; a plastic bag with a toothbrush and other items was next to the pile.

{¶ 21} On October 12, 2012, Takahashi located items in the studio that did not belong with North. The items consisted of a t-shirt, jeans, underwear, sunglasses, a toothbrush, deodorant, and shaver; some items were located in a plastic bag and others were lying nearby. Takahashi also found a glass with white powder inside. She took all of the items to the Huber Heights police station and gave them to Detective Gebhart.

{¶ 22} On October 17, 2012, Officer Bradley Reaman went to 8180 Mount Charles to photograph empty merchandise boxes for some of the items that were stolen, including boxes for a MXL V53M condenser microphone, Sylvania wireless headphones, Oxygen 25 24–key USB MIDI controller, and a MSi laptop. He also

photographed the smoke alarm that had been removed from the ceiling.

{¶ 23} The Huber Heights police conducted interviews with Demmons on three separate days: October 12, November 9, and November 21. Demmons originally told the police that he had last seen North on the Sunday or Monday before the homicide (which occurred on a Wednesday); he had denied being at North's house on October 10 and knowing who had shot North. Demmons had told the police that Stinson had a .380 caliber gun. On November 9, after the police mentioned to Demmons the possibility of a reward for information, Demmons suggested to the police that Stinson was involved in the homicide.

{¶ 24} Detective Gebhart testified that the police began to focus on Stinson on November 9, 2012, after a conversation with Demmons. On November 16, a search warrant was executed at Poole's home, 1843 Mount Charles. A box of .380 caliber ammunition was found in a filing cabinet. Detectives also found medical records related to Stinson's child and vinyl surgical gloves; Poole was a nurse and used gloves for her employment.

{¶ 25} On November 19, 2012, Detective Greg Stose, using the alias Lindsey Stark, sent a Facebook friend request to Jesse Maurice Stinson; the request was accepted. Stinson's Facebook page advertised certain items for sale, including two flat screen televisions and a laptop computer. Stose, as Stark, communicated several times with Stinson through Facebook messaging about Stark's desire to purchase the laptop. At approximately 10:00 a.m. on November 20, 2012, they arranged to meet at the McDonalds on South Main Street in Dayton. Stose coordinated with Dayton police officers and the United States Marshals' Southern Ohio Fugitive Apprehension Strike Team (SOFAST) to cover that location.

{¶ 26} Shortly after noon on November 20, Stinson arrived at the McDonalds in a white vehicle, driven by a woman; Gerry Stinson was also in the vehicle. Gerry Stinson testified that Jesse Stinson had a gun with him. At the McDonalds, Stinson and Stose (who was observing Stinson from another vehicle) continued to communicate via Facebook. At one point, Stinson sent a message asking for Stark's phone number. Detective Stose had a female detective pose as Stark, and Stinson arranged with "Stark" to meet at the 111 Building, located at 111 West First Street in downtown Dayton. Dayton police and SOFAST officers relocated to that area.

{¶ 27} Stinson and his companions drove to the 111 Building, and Stinson got out of the white vehicle. Detective Joey Myers, a uniformed Dayton police officer assigned to SOFAST, saw the white vehicle in the road behind the 111 Building and Stinson walking towards it. Myers jumped out of his vehicle and ordered Stinson to stop. Stinson ran, and Myers pursued him on foot. As Stinson went over a chain link fence near the building, Myers saw Stinson "violently slam" a laptop into the ground and then continue to run. Myers lost sight of Stinson for seven to ten seconds, and then relocated him. Stinson was apprehended on Ludlow Street after other officers in vehicles cut him off. Detective Myers asked another officer to retrieve the laptop Stinson had thrown down. The laptop's serial number matched the laptop stolen from North's residence.

{¶ 28} At approximately 2:00 p.m. on November 20, a salon customer went to the Talbot Tower, located at 131 Ludlow Street in downtown Dayton, for an appointment. The customer saw a gun in a large planter outside the building and informed salon employees, who contacted the police. Dayton Police Officer Steven Bryant, an evidence technician, collected the firearm, a Jimenez Arms .380 semiautomatic pistol; the magazine had four .380 caliber bullets inside. Bryant swabbed the pistol for DNA.

{¶ 29} Later on November 20, police officers executed a search warrant at 130 South Garfield. The officers recovered a microphone, stand, headphones, keyboard, mixer, game controller, Xbox 360 and power supply, a security door brace, two pairs of Coogi-brand boots, and two additional microphones and cables. Several of the items correlated to the merchandise boxes at North's residence.

{¶ 30} On November 21, the police interviewed Demmons again, after he was arrested for possible involvement in the homicide. Jesse Stinson and Gerry Stinson were under arrest at that time. Demmons implicated Stinson in the homicide and explained what he had witnessed on October 10, 2012.

{¶ 31} Still photographs from the Bell & Howell camera (found in the studio) were processed. Several of the photographs had been posted to Stinson's Facebook page, including several "selfies" of Stinson.

{¶ 32} Amy Dallaire, a forensic scientist at MVRCL, tested the DNA from the firearm that Officer Bryant collected. Her tests revealed a partial mixture of DNA, meaning it contained DNA from multiple people, and four (out of 15) areas of the DNA profile were found in the sample. Stinson could not be excluded as a possible

contributor to the DNA. Dallaire testified that 1 in 132 people could also be possible contributors. Neither Demmons's nor Gerry Stinson's DNA was compared to the sample.

{¶ 33} Chris Monturo, firearm and tool mark examiner for MVRCL, tested the gun. The gun was found to be operable. Monturo compared a bullet fired from the Jimenez Arms .380 semiautomatic pistol to the bullet removed from North's head during the autopsy. Monturo opined that the bullet that killed North was fired from the Jimenez Arms .380 pistol.

{¶ 34} Ervin Burnham, a computer forensic examiner, examined the laptop at Detective Gebhart's request. Gebhart had asked Burnham to determine ownership of the computer and also look for information on North, Stinson, Takahashi, and Lindsey Stark; Burnham did not look for any other names. He got 7,415 "hits" on North, 992 hits on Takahashi, 665 hits on Stinson, and 66 hits on Stark. It appeared that Stinson had used the computer, and many of the active files involved Stinson. The hits for North, Takahashi and Stark were in the computer's unallocated space. He testified that the operating system had been reinstalled on November 20, 2012, and that it would appear to the average user that the information regarding Takahashi and North had been deleted. Burnham was able to recover the information. Burham concluded that the laptop belonged to North and/or Takahashi.

{¶ 35} For purposes of the weapons under disability charge, the State submitted two judgment entries for Jesse Stinson in Case No.2007–CR–3323, which showed a conviction for possession of cocaine, a fourth-degree felony. The first judgment entry imposed a sentence of community control for the offense, and the second imposed an eight-month sentence for Stinson's violation of community control. Defense counsel stipulated that Stinson was the defendant in that case.

{¶ 36} The defense called six witnesses on Stinson's behalf. Huber Heights Police Officer Robert Hartman, an evidence technician, testified that he responded to 8180 Mount Charles on October 10, 2012 as part of the critical response team. Hartman dusted for fingerprints on all of the doors and anything that appeared to have been touched inside the studio. Hartman could not dust the beer can, because it was cold and had condensation on it, but he was able to lift latent prints from the drinking glass in the studio.

{¶ 37} Jennifer Yoak, a forensic scientist in the fingerprint section of MVRCL, testified that she received fingerprint and palm prints

8

of North, a latent print card, a partially empty water bottle, and a U.S. Polo shoebox. She obtained sets of fingerprints of Stinson and of Demmons from the fingerprint database. Several latent prints that had been taken from the drinking glass were identified as belonging to Demmons.

{¶ 38} Cynthia Poole testified that she was Stinson's girlfriend in October 2012 and that Stinson stayed with her at her residence. She recognized the Bell & Howell video camera found at North's house as belonging to Stinson, but she testified that Stinson had loaned the video camera to Demmons in September 2012. A couple of weeks later, Demmons had told Stinson that he had lost it. Poole also testified that she recognized State's Exhibit 91 as gloves she used for work. She testified that they were size small, too small for Stinson's hands. Poole indicated that the ammunition found in her room belonged to her, but she did not own or possess a firearm when her home was searched. Poole acknowledged that State's Exhibit 105, a pair of jeans, belonged to Stinson, but she suggested that Demmons might have borrowed them. Poole did not know Stinson to use drugs, but indicated he drank "quite a bit."

{¶ 39} Aaron Ballard, who is known as "Walls," testified that he became friends with Jesse Stinson through Gerry Stinson. Ballard denied being friends with Demmons, but knew who Demmons was. Ballard also denied being involved with the events of October 10, 2012. He specifically denied going to 8180 Mount Charles Street, picking up Demmons in a vehicle, and transporting Demmons to Garfield Street. Ballard stated that he did not know where Mount Charles Street was, that his license was suspended then, that he had a cast on his arm around that time, and his girlfriend drove him around.

{¶ 40} Dujuan Patton testified that he was friends with Stinson and slightly knew Demmons. In the fall of 2012, Patton lived at 130 Garfield and Jesse Stinson sometimes stayed there. Patton saw Demmons at the Garfield residence "probably every day, every other night." Patton indicated that Demmons would wear other people's clothes. Patton testified that, in October 2012, Demmons called him and, based on that call, Patton drove Demmons to Demmons's girlfriend's home in Vandalia, where Demmons picked up some duffle bags, and then Patton drove Demmons back to the Garfield residence. When Patton returned home later that night, a studio was set up at the house. Patton described the studio equipment as microphones, a microphone stand, laptops, and a keyboard. Patton acknowledged that he did not provide this information to the police.

9

{¶ 41} Clarence Sampson, an investigator for the Public Defender's Office, stated that he had interviewed Gerry Stinson about two weeks before trial and asked Gerry about the statement he (Gerry) had provided to the police; Gerry Stinson told Sampson that he (Gerry) had lied in his police statement. Gerry told Sampson that he (Gerry) had not heard Demmons ask Jesse Stinson, "Why did you shoot him?"

{¶ 42} Detective Gebhart testified again for the State as a rebuttal witness. He stated that he had met with Poole in preparation for trial, and Poole had told him that Stinson had lost the video camera only after Gebhart told Poole that the camera was found at the scene of a homicide. Poole did not say that the camera had been given to Demmons. Gebhart further testified that he introduced himself to Patton when the search warrant was executed at 130 Garfield in November 2012; Patton did not get in touch with Gebhart after that date.

*State v. Stinson,* 2015-Ohio-4405 (Ohio App. 2d Dist. Oct. 23, 2015). Stinson took no direct appeal to the Ohio Supreme Court from the judgment of conviction; his pre-sentence motion for new trial was denied October 7, 2014, and the denial was not appealed.

To litigate constitutional claims which depend on evidence outside the direct appeal record, Ohio provides a post-conviction relief remedy in Ohio Revised Code § 2953.21. On May 18, 2015, Stinson moved *pro se* for post-conviction relief under that statute, but without including any actual claims (State Court Record, ECF No. 12, Ex. 13). On June 4, 2015, Stinson moved to amend to state as claims

(1) "Statement of witness as to the ownership of said murder weapon,"

(2) Misconduct of detectives['] techniques of information gaining,

(3) Misconduct of Detective Gebhardt at trial by helping witness with questioning,

(4) Petitioner's request for change of venue which biased him by refusal.

(State Court Record, ECF No. 12, Ex. 17).

The trial court denied the Petition November 16, 2017, including a claim that defense counsel had provided ineffective assistance (Decision, State Court Record, ECF No. 12, Ex. 22). Stinson did not appeal.

On February 27, 2018, Stinson filed two motions for new trial (State Court Record, ECF No. 12, Exs. 26 & 27).  He again claimed prosecutorial misconduct, ineffective assistance of trial counsel, and new evidence.  In his own supporting affidavit, he relates hearsay from Reginald Langford, but provides no affidavit from Langford himself.  The second of these motions has an attached Affidavit from Langford which says he told Stinson's lawyer that "Jimmy" brought the gun to the house. *Id.*, Ex. 27, at PageID 478.

Judge Gorman denied the Motions, noting that ownership of the gun was irrelevant and the ineffective assistance of trial counsel claim was barred by *res judicata* under *State v. Perry,* 10 Ohio St. 2d 175 (1967).  The Second District Court of Appeals affirmed in *State v. Stinson*, 2019-Ohio-3400 (Ohio App. 2d Dist. Aug. 23, 2019), and the Ohio Supreme Court dismissed Stinson's untimely appeal (Entry, State Court Record, ECF No. 12, Ex. 43).

Stinson's subsequent direct attacks by motion for new trial or collateral attacks on his conviction have all been unsuccessful.  Stinson asserts he placed his Petition in this case in the prison mail system on April 18, 2025, which counts as the date of filing under *Houston  v. Lack,* 487 U.S. 266 (1988).

Petitioner pleads the following grounds for relief:

> **Ground One**: The State Of Ohio Violated Petitioner's Sixth Amendment To The United States Constitution, Right To A Public Trial, As Applied Through The 14th Amendment, By Excluding A Portion Of The Public From The Petitioners Trial.
>
> **Ground Two**: The State Denied Petitioners Sixth Amendment To The United States Constitutional Right To A Fair And Impartial Jury

When A Juror Failed To Answer A Question On Voir Dire, That Had A Correct Response Been Provided, Would Have Provided A Valid Basis For A Challenge For Cause.

**Ground Three**: The State Deprived Petitioner Of His Right To Due Process Of Law As Required By The Fifth And Fourteenth Amendments To The United States Constitution, And His Right To Be Present At Every Stage Of The Proceedings, When The Trial Court Engaged In Substantive Communication, In Writing, With The Jury, In Spite Of Counsels Objections.

**Ground Four**: The State Violated Petitioners Fourteenth Amendment Right To Due Process When It Failed To Disclose That It Had Made An Implied Agreement With An Accomplice Witness.

**Ground Five**: The State of Ohio Deprived The Petitioner of His Sixth Amendment to The United States Constitution Right to A Fair Trial and Effective Assistance of Counsel when his Attorney Failed To Object To The Seating Of A Bias Juror.

**Ground Six**: The State Deprived Petitioner Of His Sixth Amendment To The Constitution Of The United States Right To Effective Assistance Of Counsel When Counsel Failed To Prepare for Trial by Reviewing Discovery, Investigate And Interview A Key Witness.

(Petition, ECF 1, PageID 9-29).


**Statute of Limitations Analysis**


The Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") enacted the applicable statute of limitations which is codified at 28 U.S.C. § 2244(d) and provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Respondent calculates that Stinson's conviction became final on December 7, 2015, the last day on which he could have timely appealed on direct review to the Supreme Court of Ohio, but did not do so (Motion, ECF No. 13, PageID 1040). Respondent concedes the statutory time was tolled under § 2244(d)(2) during the pendency of Stinson's timely-filed petition for post-conviction relief from May 18, 2015, until dismissal by the Court of Appeals on November 17, 2017. It also concedes time was again statutorily tolled during the pendency of Stinson's motion for new trial from February 27, 2018, until August 23, 2019. Respondent further concedes statutory tolling during the pendency of Stinson's application to the Second District for reconsideration from September 16, 2019, until December 6, 2019. Assuming for the sake of argument that all these actions provided statutory tolling, Respondent asserts the AEDPA

limitations period resumed running on December 7, 2019, until it expired 239 days later on August 2, 2020. Because August 2, 2020, was a Sunday, Stinson had until Monday, August 3, 2020, to timely file his instant petition, per Fed.R.Civ.P. 6. His actual filing date here – April 18, 2025 – is more than four and one-half years later.

Petitioner responds by claiming the benefit of 28 U.S.C. § 2244(d)(1)(B) under which the statute of limitations would not begin to run until [1] removal of an impediment to filing [2] created by unconstitutional or federally unlawful state action was removed [3] if that state action prevented the filing of the habeas petition. He "requests this court to find that the date on which the impediment to filing an application was removed, commenced in either 2019 when he received the transcripts or at the later date in 2022 when he was able to review them." (Memo in Opp. ECF No. 18, PageID 1089).

Stinson acknowledges that most federal courts considering the issue have held that failure of the state to provide a transcript does not constitute an impediment to filing (Memo in Opp., ECF No. 18, citing, *inter alia*, *Lloyd v. Van Natta*, 296 F.3d 630 (7th Cir. 2002), and *Howard v. Tibbals* 2013 U.S. Dist. LEXIS 183768 (N.D. Ohio 2013)). In *Lloyd* the Seventh Circuit held failure of the State to furnish a complete trial transcript would support neither statutory tolling under §2244(d)(1)(B) nor equitable tolling.

Stinson, however,

> contend[s] that when the privation of transcripts involves a breakdown in the enforcement of a state rule, which in turn denied him a fair opportunity to seek relief in the state courts, then it should be sufficient to meet the tolling mechanism of Sec. 2244 (d)(l)(B), [c]ontrary to the Circuit['s] previous findings.

(Memo. In Opp., ECF No. 18, PageID 1091). He asserts failure of the State to furnish him with a transcript interfered with his ability to seek a new trial and to seek reopening of his direct appeal.

Stinson's February 27, 2018, motion for new trial evinces no need to consult the trial transcript nor any reference to the transcript. Judge Gorman denied the motion on the basis of *res judicata* because the issues could have been raised on direct appeal many years earlier and lack of any new evidence justifying a new trial (Decision, State Court Record, ECF No. 12, Ex. 32). Stinson has not shown this Court that he needed to consult the transcript to file this motion for new trial.

On February 7, 2023, Stinson filed another motion for leave to file a delayed motion for new trial (Motion, State Court Record, ECF No. 12, Ex. 51). He attempted to excuse his late filing by reporting that he had received the transcript in February, 2019, but shortly thereafter became involved in a fight with other inmates which resulted in his transfer to another institution and subjection to medication. *Id.* at PageID 657. His claim in the Motion for New Trial is that a juror was biased against him because she was the third cousin of a State's witness. In denying the Motion, Judge Solle, who had succeeded Judge Gorman, found that Stinson had not shown by clear and convincing evidence that he was prevented from discovering the factual basis of this claim much earlier than when he filed (Decision, State Court Record, ECF No. 12, Ex. 59, PageID 825). That finding of fact is entitled to deference under 28 U.S.C. § 2254(d)(2). In addition, Stinson has made no showing of how this claim depended on his having the transcript.

In sum, Stinson has not shown that he needed the transcript to file the underlying state requests for relief. It follows logically that he did not need the transcript to file his petition in this Court.

Even if consulting the transcript were necessary either here or in the state courts, Stinson cannot plausibly blame his lack of the transcript on unlawful conduct by the State of Ohio. States have an equal protection obligation to provide a trial transcript to an indigent appellant if the state

appeals courts require such a transcript. *Griffin v. Illinois*, 351 U.S. 12 (1956). But Ohio fulfilled that obligation by providing the trial transcript for direct appeal. Stinson recounts (without documenting) his effort to obtain the transcript from his appellate counsel. But counsel was not acting on behalf of the State in withholding the transcript.

Aside from his argument about the transcript, Petitioner claims a later start date for Grounds One, Four, and Six as to which he claims he only discovered the factual predicates "sometime around December 15th, 2021." (Memo in Opp., ECF No. 18, PageID 1098). He claims he did not learn of the predicates "until his family hired a private investigator to interview the victim's mother after she contacted his family with complaints about her treatment at trial." *Id.* at PageID 1099-1100).

Attached to Stinson's Successive Petition to Vacate starting at PageID 762 is the October 2021 Affidavit of Vanessa Postway-Dewberry. She avers that she came to Stinson's trial

> On September 9th, 2014, when the State's main witness was going to testify, I drove my truck to the Montgomery County Courthouse, and I was seated in the back of the courtroom. I had recently undergone knee replacement surgery on my right knee.
>
> I was there for the first part of the proceedings that day. I was there when the judge walked in and everybody stood up. While the court was in recess·, I saw the judge and Miss Sandy Hunt, Director Victim/Witness Division, Montgomery County Prosecutor's Office, speaking at the front of the courtroom. Then Miss Sandy approached me at the back of the courtroom and told me to go home and take care of my leg. Since she was telling me to go home; I asked her for a copy of the trial CD. She asked me how many I would need, and I told her four (4) or five (5). I don't remember the exact number I asked for. After the trial was over, I had to go to the courthouse to pick up the copies of the trial CD, but I did not have to pay for them.

(State Court Record, ECF No. 12, Ex. 54, PageID 762). Stinson offered this Affidavit in support of his claim that he was denied a public trial, but it simply says nothing of the sort. The victim-witness coordinator would have known Ms. Postway-Dewberry because she was the mother of the

deceased victim. Her compassionate suggestion to this lady that she go home to take care of her knee in no way proves she was excluded from the trial. It is widely known how painful recovery from knee replacement surgery can be and that it is best to keep the affected leg elevated. In any event the witness does not say she understood she was excluded. The Affidavit does not include a statement that this witness had "spoken to petitioners Co-Defendant and he stated he was provided immunity and money for his role in petitioner's trial," although Stinson asserts it does (Memo in Opp., ECF No. 18, PageID 1100).

Stinson also filed his own Affidavit about his observations during trial that witnesses were told to remain in the hallway at the courthouse. This is a common measure to facilitate separation of witnesses under the Ohio Rules of Evidence. Stinson cites no precedent and none is known to the Court holding that the right to a public trial overrides the necessity of separating witnesses. And in any event, Stinson observed these persons in the hallway during trial, not years later, so he knew of this predicate for a public trial claim during trial and it could have been raised on direct appeal, but was not. As Stinson himself points out, learning the predicate is far different from having all the evidence needed to support a claim.

In Ground Four Stinson asserts a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), that the State had an implied agreement with an "accomplice witness" for immunity from prosecution and to pay him for his testimony which the State did not reveal. Based on this claim, Stinson asks the Court to find the "triggering date" for Ground Four to be December 17, 2021 (Memo in Opp., ECF No. 18, PageID 1101). But he is unclear what it is that he learned on December 17, 2021, that was a factual predicate for this claim. He certainly knew that the referenced person testified at trial, but the Court is not told, at least at this point in the Memorandum (PageID 1103, labeled

17

as page 21 of 52), what Stinson learned December 17, 2021.[1]

Turning to his argument that his asserted mental incompetence excuses his late filing, Stinson relies on *Ata v. Scott*, 662 F.3d 736 (6th Cir. Nov. 28, 2011). In that case the Sixth Circuit held that a serious and protracted mental illness could support a case for equitable tolling of the statute of limitations. The court found he was entitled to an evidentiary hearing on that issue, based on "specific allegations of his long history of severe mental illness and the effect on his mental capacity of this illness and of the medications he took for it." *Id.* at 738.

The facts of Ata's case are substantially different from this case. Ata shot and killed someone after a verbal confrontation about his spending money ($20) which had been given to him to buy items for a neighbor. Already at arraignment his competency to stand trial was raised as an issue and he spent a year in a Michigan psychiatric hospital being restored to competence. Despite this he was convicted of intentional murder in a bench trial and sentenced to life imprisonment.

> The record developed in Ata's post-conviction proceedings included medical documents reflecting a history of mental illness, including numerous hospitalizations prior to incarceration and a diagnosis of paranoid schizophrenia. Documents, which dated from the 1970s, show that Ata had once threatened to kill his family, that he was delusional and paranoid, and that, while at times cooperative and friendly, he could also quickly become agitated and hostile.

Against this factual background, the Sixth Circuit held

> a petitioner's mental incompetence, which prevents the timely filing of a habeas petition, is an extraordinary circumstance that may equitably toll AEDPA's one-year statute of limitations. To obtain equitable tolling of AEDPA's statute of limitations on the basis of mental incompetence, a petitioner must demonstrate that (1) he is mentally incompetent and (2) his mental incompetence caused his failure to comply with AEDPA's statute of limitations.

---

[1] The Memorandum in Opposition is fifty-two pages long and is not easy to follow.

*Id.* at 742. The court noted that whether to hold an evidentiary hearing continued to be committed to the sound discretion of the district court and equitable tolling should be granted sparingly. *Id.* at 741, citing *Solomon v. United States,* 467 F.3d 928, 933 (6th Cir. 2006), and decided on a "case-by-case basis," *Id.*., citing *Keenan v. Bagley,* 400 F.3d 417, 421 (6th Cir. 2005). The district court must review the state court record in order to establish whether petitioner's assertions are refuted by the record or otherwise without merit. *Id.* at 742.

Stinson asserts he

> had until roughly August 4th, 2020 to file his habeas petition. Petitioner, however, offers that he was incapacitated during this period until roughly between August 21st, 2022 or upon the filing of his post-conviction Motions and Petitions on April 18th, 2023. Petitioner would humbly request this court to equitably toll his time for filing the petition either due to the dangerous use of neurotechnology on him during his time in ODRC's Custody or due to a severe breakdown in his mental faculties, as is supported by ODRC's Mental Health Departments and other collateral evidence of a pattern of mis-use of the technology on other prisoners.

(Memo in Opp., ECF No. 18, PageID 1111-12).

Shortly after the quoted language, Stinson begins a lengthy discussion of the science of neurotechnology. This section of the Memorandum in Opposition includes such sections as Establishing Forced Incompetence Through The Exploits Of ODRC and/or Unauthorized Organizations (PageID 1112), Understanding Emerging Neurological Science (PageID 1113), Understanding Neuronal Technologies and Their Weaponization (PageID 1117), Constitutional Approach to Weaponized Impairment Neurotechnologies (PageID 1120), and Making A Causal Connection To Petitioner Missing His AEDPA Statutory Deadline (PageID 1125). Stinson asserts he can interpret all this for the Court, claiming to be "a radiation scientist myself," (PageID 1115). In discussing the weaponization of neurological devices, he claims "our country is under neurological attack at the hands of terrorist[s]." (PageID 1120). Judges do not understand the

problem because they are scientifically illiterate (Memo in Opp., ECF No. 18, PageID 1125-26)[2].

Having finished this scientific disquisition, Stinson returns to his own situation.

> Around August of 2010 petitioner was physically attacked by intruders, who had broken into his investment property in Dayton, Ohio, and Tortured him via repeated blows to his skull and other extremities, with a hammer, as well as firing a single shot into his body. He was left with severe brain trauma, that left him in a yearlong attempt to cling to consciousness. Sometime later, petitioner overcame temporary paralysis by learning how to walk again.

(Memo in Opp. ECF No. 18, PageID 1126). From 2010, the text skips ahead to 2019, five years after the trial of this case and well into Stinson's imprisonment.

> Though there were very few recorded complaints during the early years of petitioner's incarceration, in respects to neurological issues. That changed around July 1st, 2019 while he was at North Central Correctional Institution in Marion, Ohio Just as full recovery seemed possible. At which time the severe headaches he experienced in November 2012 restarted, this time with auditory hallucinations, dizziness and intermittent pains, focused mostly on the spinal cord.
>
> Correctional Officers and the "bad actors", armed with information from some unknown source, began directing attacks by other prisoners. Eventually by November of 2019 petitioner was placed in segregation upon which the medical staff subjected petitioner to small amounts of radiation through an X-Ray machine, without standard protection vest, see E006, fed him feces and other neurophannacuticals that maximized the devices influence and impairment ability, See Dismissal Request ECF 12 PageID 754-757. By the time petitioner arrived at London Correctional Institution (LOCI), his condition was unmanageable. Once he was placed in segregation, the auditory/visual hallucination, caused by nuerofeedback, modulatory and directed energy delivery systems, amplified dramatically. See Exhibit E003 Prism: P. 50 . E006 Kensler Email . E016 Stinson Affidavit '21 . E017 Stinson Affidavit

---

[2] On the subject of judicial illiteracy, Stinson cites David L. Faigman Prof. Of Law Symposium: The Role Of The Judge in the Twenty-First Century: Judges as Amateur Scientist, 86 B.U.L. Rev. 1207 (2006). Stinson asserts: "Professor Faigman's final proclamation to the judicial community, is a sentiment shared by hundreds of thousands of citizens across the United States and one that will have an immense effect on the outcome of this case. He states "Judges' illiteracy in science means that they are ignorant regarding certain premises that are essential to modem judicial discourse. Judges no longer have any choice: their failure to become amateur scientists means their failure as professional judges." (PageID 1124).

> Petitioner was not the only Prisoner suffering from identical symptoms at LOCI, nor was he the only prisoner with similar, if not the matching, diagnosis by Dr. De Silva. Considering this information, there are some questions as to if the Institution was using this technology on other prisoners, at the same time. Regardless, Petitioner was transferred to a Mental Health/Medical Health facility where the actions, such as "Sensory Decoding" and Nervous System tampering, by "Bad Actors" and ODRC Staff continued, until he was transferred back to Minimum Security Institution, at LOCI on June 5th, 2021.

Based on this account of his purported mental incompetence and relying on *Ata, supra,* Stinson seeks an evidentiary hearing on this portion of his equitable tolling argument. The Magistrate Judge denies the request for an evidentiary hearing for the following reasons.

First of all, Stinson does not claim to be currently mentally incompetent. Rather, his supposed incompetence is said to exist for some unspecified period of time after he got the transcript and before he filed here. He offers no evidence of incompetence prior to his conviction or at the time of his trial. His account of home invasion with beating leading to severe mental trauma is not supported by any evidence. There was no claim of mental incompetence at the time for trial nor for many years thereafter, during which Stinson filed many pro se pleadings. If competent for those, why not competent to file a habeas corpus petition?

Second, his lengthy account of neurotechnology is all based on publicly-available academic writing. He offers no evidence that any competent scientist has examined him and diagnosed incapacitating mental illness for the relevant period. Mindful of Stinson's references to judicial scientific illiteracy, the Court relies on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). In that case the Supreme Court cautioned against accepting purportedly scientific opinions without considering 1) whether the expert's scientific technique or theory can be, or has been, tested; 2) whether the technique or theory has been subject to peer review and

publication; 3) the known or potential rate of error of the technique or theory when applied; 4) the existence and maintenance of standards and controls; and 5) whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 592-95; *Hardyman v. Norfolk & W. Ry.*, 243 F.3d 255, 260 (6th Cir. 2001).

Third, even accepting Stinson's broadest claims for equitable tolling by mental incapacitation, the period of tolling ended more than a year before he filed.

Petitioner has not demonstrated that his Petition was timely when it was filed on April 18, 2025. The Petition should be dismissed as barred by the statute of limitations.

**Procedural Default Analysis**

Respondent also asserts Stinson's claims are "all barred from merit review by his unexcused failure to fairly present his claims to the state courts" (Motion, ECF No. 13, PageID 1048).

Stinson begins his response by correctly citing the governing standard. The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Barton v. Warden, S. Ohio Corr. Facility,* 786 F.3d 450, 464 (6th Cir. 2015), *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .

> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); accord, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), *quoting Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

Ohio has a rule that requires all claims which can be presented on direct appeal to be presented there or be barred by *res judicata* in subsequent proceedings. *State v. Perry,* 10 Ohio St. 2d 175 (1967); *State v. Davis*, 119 Ohio St.3d 422, ¶ 6 (2008), citing *State v. Hutton,* 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 37; *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 143, 652 N.E.2d 710 (1995). Ohio courts have consistently applied this rule. *State v. Cole*, 2 Ohio St. 3d 112 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16 (1981).

Judge Gorman applied *res judicata* to the claims raised by Stinson in his February, 2018, motion for new trial. (Decision, State Court Record, ECF No. 12, Ex. 32). The Second District affirmed that decision. *Id.* at Ex. 39. Judge Solle again applied the doctrine in denying Stinson's later motion for new trial. *Id.* at Ex. 59.

The Sixth Circuit has repeatedly held the Perry *res judicata* doctrine is an adequate and independent state ground of decision. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir.

1994)(citation omitted); *Van Hook v. Anderson*, 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001).

Other procedural bars in Ohio law which are applicable include the time limits on motions for new trial, on petitions for post-conviction relief (one year from completion of the record on appeal), and on applications for reopening of direct appeal to litigate claims of ineffective assistance of appellate counsel (ninety days). Ohio also limits a defendant to one petition for post-conviction relief, depriving trial courts of jurisdiction to entertain subsequent petitions unless the petitioner satisfies Ohio Revised Code § 2953.23. Finally, Ohio appellate courts will entertain only one application for reopening under Rule 26(B).

At one point in his Memorandum in Opposition, Stinson asserts:

> Respondent makes a valid complaint in its dismissal request concerning petitioner's socalled fault in not filing an application to re-open his appeal, under Ohio's App. R. 26 (B), but, it does so laggardly. It is clear that respondents are referring to the grievances that were record reliant. Though the state failed to argue such in the trial court or on appeal, they are only partially correct. Petitioner was not limited to a request to reopen his appeal but could also move the state to address his grievances through the New Trial mechanism under Ohio's Criminal Rules, thus, procedural default is not an adequate defense.

(Memo in Opp., ECF No. 18, PageID 1104). However, the Ohio Supreme Court has held that an application for reopening is the only remedy provided in Ohio law for ineffective assistance of appellate counsel. *State v. Murnahan*, 63 Ohio St. 3d 60 (1992).

Stinson argues for an exception to *res judicata* for facts of which a petitioner was not aware:

> The next exception is claims that are premised on factual allegations in which petitioner was unaware, the doctrine of *res judicata* does not apply. See *State v. Jackson* 2025-0hio-2363 21 (8th App. Dist. Cuyahoga). Petitioner's grounds Two, Three and Five, whose factual allegations were, for the most part, evidenced by the record were not discovered until roughly August 1st, 2022.

(Memo in Opp., ECF No. 18, PageID 1107). Even assuming the relevance of this argument, the

24

Magistrate Judge notes Stinson admits having knowledge of these facts in August 2022, more than two years before he filed.

In very confusing language[3] Stinson argues against the Second District's application of Ohio Revised Code § 2953.23 to his case (Memo in Opp., ECF No. 18, PageID 1109).  He does not cite where in the almost one thousand page State Court Record this occurs.  The Magistrate Judge assumes he is referring to the Second District's decision affirming denial of his second post-conviction petition which cites Ohio Revised Code § 2953.23 for the jurisdictional bar it applied to second or successive post-conviction petitions (Final Entry and Opinion, State Court Record, ECF No. 12, Ex. 66, ¶¶ 16-22).  Ohio Revised Code § 2953.23 closely parallels 28 U.S.C. § 2244(b) which precludes second or successive habeas corpus petitions in federal court without permission of the circuit court of appeals.  That demonstrates the rule is reasonable but independent of federal law.  Likewise the Second District's conclusion that Stinson showed no prejudice because conviction would likely have occurred regardless of the error is a completely reasonable conclusion.

Entirely apart from his failure to meet the statute of limitations, Stinson's claims are barred by his numerous procedural defaults in presenting his claims to the Ohio courts.  Those defaults are all pursuant to well-established Ohio procedural requirements with which Stinson did not comply and on which the Ohio courts held his non-compliance against him.  The Petition should be dismissed with prejudice because all its claims are procedurally defaulted.

---

[3] "First the States reasoning relies wholly on the final thorn of the procedure, which must turn on the facts of the case and requires an application of fact finding thru the merits of the compliant."  What does this mean?

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

October 7, 2025.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6, but service is complete when the document is mailed, not when it is received. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.